STEVEN S. GLICKMAN, ESQ. (admitted *Pro Hac Vice*)
**LITE DEPALMA GREENBERG, LLC**
570 BROAD STREET – SUITE 1201
NEWARK, NJ 07102
Tel: (973) 877-3823
Fax: (973) 623-0858
sglickman@litedepalma.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

---------------------------------X

JACOB R. GLICKMAN**,**

                 Plaintiff,

-against-

MAINE-NILES ASSOCIATION OF SPECIAL
RECREATION; BLAIRE E. PRITCHARD,
in her official and individual
capacities; and LAUREN C. RUIZ, in
her official and individual
capacities.

                  Defendants.

---------------------------------X

**Case No. 18-4907**

**SECOND AMENDED COMPLAINT
AND JURY TRIAL DEMANDED**

    NOW COMES Plaintiff, JACOB R. GLICKMAN, by and through his attorneys LITE DEPALMA GREENBERG, LLC, and for cause of action against the defendants, both jointly and severally, respectfully states as follows:

**INTRODUCTION**

    1. On July 20, 2017, Plaintiff was falsely accused of certain acts of misconduct by Blaire E. Pritchard ("Defendant Pritchard") and Lauren C. Ruiz ("Defendant Ruiz") while employed by Maine-Niles Association of Special Recreation ("Defendant

Maine-Niles") for the sole purpose of having Plaintiff arrested for lawfully asserting his constitutional rights.

2.   Plaintiff, then a resident of Morton Grove, was a Chicago Public Schools vendor, owning and operating Chicago Enrichment Programs, LLC, an organization operating a before and after school program for students at the Solomon School in Chicago, Illinois.

3.   In June 2017, Plaintiff, purchased a puppy and began taking him to Austin Park, a public park in Morton Grove, which had been designated as a "dog-friendly park" by the Morton Grove Park District.

4.   Defendant Maine-Niles operated a "camp" from approximately noon until 6:00pm, utilizing Austin Park as a camp facility.

5.   Defendant Ruiz was a Program Manager for Defendant Maine-Niles at the time.

6.   Defendant Pritchard was a Site Manager for Defendant Maine-Niles at the time.

7.   After approximately one week of both Plaintiff and his puppy and Defendant Maine-Niles' camp being present at Austin Park, Defendant Pritchard decided she did not want Plaintiff to be present at the park while the camp was operating.

8.   Plaintiff informed Defendant Pritchard that Austin Park was a public park and that he and his puppy had every right to continue to go to the park.

772818.1

9.    On July 20, 2017, when Plaintiff informed Pritchard of his intention to continue to go to the park, Defendant Pritchard and Defendant Ruiz contacted the Morton Grove Police Department. Over the course of a number of hours, Defendant Pritchard and Defendant Ruiz supplied the Morton Grove Police Department with false information regarding Plaintiff's conduct at Austin Park for the sole purposes of having Plaintiff arrested and banned from Austin Park.

10.    Defendants Pritchard and Ruiz were ultimately successful.  Plaintiff was subsequently arrested and charged with disorderly conduct, said charge ultimately being dismissed.

11.    News of Plaintiff's arrest was communicated to the Morton Grove Park District which, by correspondence dated July 21, 2017, banned Plaintiff from Austin Park during the hours of 8:00am and 4:00pm, Mondays through Fridays until August 31, 2017.

12.    News of Plaintiff's arrest reached the Chicago Public Schools and caused Plaintiff to lose his contract with The Solomon School, thereby losing his livelihood.

### PARTIES

13. Plaintiff was at all times relevant an adult resident of Morton Grove, Illinois.

14. Defendant Maine-Niles Association of Special Recreation, is an organization with its main office located at 6820 W. Dempster Street, Morton Grove, Illinois.

15. Defendants Ruiz and Pritchard, are and were at all times relevant herein, officers, employees and agents of the Defendant Maine-Niles. Defendants Ruiz and Pritchard are being sued individually and in their official capacities. At all times relevant herein, Defendants Ruiz and Pritchard were acting in the course and scope of their duties and functions as agents, servants, employees, and officer of Defendant Maine-Niles and otherwise performed and engaged in conduct incidental to the performance of their functions in the course of their duties. They were acting for and on behalf of Defendant Maine-Niles at all times relevant herein with the power and authority vested in them as officers, agents, and employees of Defendant Maine-Niles and incidental to the pursuit of their duties as officers, employees, and agents of the Defendant Maine Niles.

## JURISDICTION AND VENUE

16. The incidents which give rise this cause of action occurred within this jurisdiction within one year of the filing of this Complaint.

17. Venue is proper in this venue pursuant to 28 U.S.C. § 1391 as all of the defendants are residents of this district and/or all of the acts or omissions which give rise to this cause of action occurred within this district.

18. Jurisdiction is proper pursuant to federal question jurisdiction, 28 U.S.C. § 1331, 28 U.S.C § 1343(a)(3)(4) and 42

U.S.C. § 1983. Plaintiff further invokes the pendent and supplemental jurisdiction of this Court to hear and decide claims arising under state law pursuant to 28 U.S.C. § 1367.

19. Plaintiff avers that defendants do not have immunity for violating the civil rights of citizens.

**FACTUAL ALLEGATIONS**

20. Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

21. On July 20, 2017, Plaintiff took his puppy to Austin Park. Also present at the park was a "camp" operated by Defendant Maine-Niles.

22. Plaintiff and Defendant Maine-Niles' camp personnel had interacted at Austin Park almost daily for approximately ten (10) days prior to July 20, 2017.

23. On July 19, 2017, Defendant Pritchard, asked Plaintiff to keep his puppy separate from the campers.

24. Shortly after Plaintiff arrived at Austin Park on July 20, 2017, Defendant Pritchard contacted Defendant Ruiz, informing her that Plaintiff had arrived at the park.

25. Upon receiving Defendant Pritchard's telephone call, Defendant Ruiz called the Morton Grove Police Department with the intent of having Plaintiff removed from Austin Park.

772818.1

26. On July 20, 2017, Morton Grove Police Department Police Officers Walsh ("Officer Walsh") and Otto ("Officer Otto") met Defendants Pritchard and Ruiz at Austin Park. At that time, Defendants Pritchard and Ruiz provided the Officers Walsh and Otto with false and defamatory statements about Plaintiff as follows:

a. According to the Case Narrative filed by Officer Walsh[1] (Exhibit A, p. 1, para. 2), Pritchard told him Plaintiff had been acting suspiciously for the past week and half. However, Pritchard's official Defendant Maine-Niles "Documentation Form"[2] (Exhibit B) indicates that her first encounter with Plaintiff was on July 13th and that Plaintiff only introduced himself to her and told Pritchard the age and name of his dog. Even Ruiz, who did not observe any of Plaintiff's alleged conduct, indicated in her "Documentation Form"[3] (Exhibit C, p. 1, para. 1), that Plaintiff's first interaction with Pritchard was friendly.

b. According to the Case Narrative filed by Officer Walsh (Exhibit A, p. 1, para. 7), Pritchard told Officer Walsh that her first encounter with Plaintiff was on July 11th; that Plaintiff told campers information about himself and his dog; and, that thereafter Plaintiff continued to initiate conversations with some

---

[1] This redacted document was obtained from the Village of Morton Grove via an OPRA request.
[2] This redacted document was obtained from the Village of Morton Grove via an OPRA request.
[3] This redacted document was obtained from the Village of Morton Grove via an OPRA request.

772818.1

of the campers. However, Pritchard's official Defendant Maine-Niles "Documentation Form" (Exhibit B) indicates that her first encounter with Plaintiff was on July 13th and that Plaintiff only introduced himself to her and told Pritchard the age and name of his dog.

c.  According to the Case Narrative filed by Officer Walsh, (Exhibit A, p. 1, para. 8), on July 13th Pritchard told Officer Walsh she observed Plaintiff letting his dog run towards the campers. Pritchard also said she observed a camper separated from the group holding Plaintiff's dog and talking to Plaintiff. Pritchard said she intervened and separated Plaintiff from the campers. However, Pritchard's official Defendant Maine-Niles "Documentation Form" (Exhibit B) indicates that Plaintiff introduced himself to her and told Pritchard the age and name of his dog. There is no reference to what Officer reported Pritchard told him.

d.  According to the Case Narrative filed by Officer Walsh, (Exhibit A, p. 1, para. 10) Pritchard told Officer Walsh that on July 18th, Pritchard observed a camper running passed Plaintiff, who attempted to stop the camper. Pritchard told Officer Walsh she intervened, told Plaintiff about the campers' disabilities, and asked Plaintiff to keep his dog away from the campers. However, Pritchard's "Documentation Form" (Exhibit B) states that Plaintiff had no interaction with either campers or Pritchard that

day.  Nowhere at all in Pritchard's Documentation Form is this alleged incident recorded.

e.  According to the Case Narrative filed by Officer Walsh, (Exhibit A, p. 1, para. 11), Pritchard told Officer Walsh that on July 19th, unidentified "camp staff" observed Plaintiff approaching some of the campers and calling out to them by their names and that Plaintiff was asking unidentified camp staff about certain campers and their medical conditions, although Pritchard told Officer Walsh about their disabilities the previous day.  However, none of these allegations were contained in Pritchard's "Documentation Form" (Exhibit B).

f.  According to Ruiz' "Documentation Form" (Exhibit C, p. 2, top paragraph), Pritchard reported that while Plaintiff was at the park on July 19th, a male camper was "laying on the park bench without his shirt on before the pool" and a drone was overhead and hovering over him.  There is no reference to this in Pritchard's "Documentation Form" and there is no pool at Austin Park.  Plaintiff never owned or operated a drone and there is no allegation that he was observed operating a drone.

g.  According to the Case Narrative filed by Officer Walsh (Exhibit A, p. 2, para. 12), Plaintiff initiated conversation with "camp staff" and when notified, Pritchard confronted Plaintiff.  However, the "Documentation Form" (Exhibit D) submitted by a

counselor identified only as Rose[4] approached to retrieve his dog and stated to the dog "we can't go over here ernie" and that Plaintiff subsequently approached Pritchard and not that Pritchard "confronted" Plaintiff.

h.   According to the Case Narrative filed by Officer Walsh, (Exhibit A, p. 1, para. 4) Pritchard told Officer Walsh that on July 20th she observed Plaintiff taking pictures "in the direction of" two female juveniles.  Ruiz indicated in her "Documentation Form (Exhibit C, p.2, 2nd full para.) that she told Officer Walsh that Plaintiff was actually taking pictures of the juveniles. However, there is nothing in Pritchard's "Documentation Form" (Exhibit B) referencing Plaintiff taking photographs.  Moreover, in Pritchard's sworn testimony at Plaintiff's disorderly persons trial (Exhibit E, p.13), Pritchard testified that after her encounter with Plaintiff, she took the campers and counselors inside the field house. As she was doing so, she observed Plaintiff walking away and "started engaging" with two females not in the camp.  In her testimony Pritchard did not make any reference to observing Plaintiff taking photographs.

27.  The false information provided by Defendants Ruiz and Pritchard to Officers Otto and Walsh contributed to Plaintiff's arrest for disorderly conduct, ultimately to Plaintiff being

---

[4] This redacted document was obtained from the Villager of Morton Grove via an OPRA request.

banned from Austin Park during the hours of 8:00am and 4:00pm, Mondays through Fridays until August 31, 2017 and to Plaintiff losing his contract with The Solomon School of Chicago Public Schools, thereby losing his livelihood.

28.  Plaintiff moved to dismiss the disorderly conduct charge against him and the Honorable Aleksandra Gillespie granted Plaintiff's motion to dismiss the disorderly conduct charge, finding that the information on the Complaint failed to show that Plaintiff's conduct had breached the peace.

## COUNT I

### DEFAMATION AS TO DEFENDANTS RUIZ AND PRITCHARD

29. Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

30. Said statements made by Defendants Ruiz and Pritchard were of and concerning Plaintiff.

31. Said statements made by Defendants Ruiz and Pritchard were made without any recognized privilege.

32. Said statements made by Defendants Ruiz and Pritchard were made with knowledge that the statements were false.

33. Said statements made by Defendants Ruiz and Pritchard were made with reckless regard to the truth.

34. Said statements made by Defendants Ruiz and Pritchard were made with common law malice, or ill will towards Plaintiff.

772818.1

35. Said statements made by Defendants Ruiz and Pritchard constituted defamation.

36. Said statements made by Defendants Ruiz and Pritchard were damaging to Plaintiff in that they ultimately caused him to be arrested.

37. Said statements made by Defendants Ruiz and Pritchard were damaging to Plaintiff in that they caused Plaintiff to be banned from Austin Park by the Morton Grove Park District for the remainder of July and August, 2017, Monday through Friday, from 8:00am to 4:00pm.

38. Said statements made by Defendants Ruiz and Pritchard were damaging to Plaintiff in that they caused Plaintiff to lose his contract with The Solomon School of Chicago Public Schools, thereby losing his livelihood.

39. Said statements made by Defendants Ruiz and Pritchard were damaging to Plaintiff in that they impugned Plaintiff's integrity and morality and damaged Plaintiff's reputation in the community.

**COUNT II**

**FALSE LIGHT AS TO DEFENDANTS RUIZ AND PRITCHARD**

40. Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

772818.1

41. The false statements made by Defendants Pritchard and Ruiz about Plaintiff placed Plaintiff in a false light before the public, including Chicago Public Schools, as an individual engaged in inappropriate conduct with children.

## COUNT III

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST DEFENDANTS PRITCHARD AND RUIZ

42. Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

43. The conduct of Defendants Pritchard and Ruiz was extreme and outrageous.

44. Defendants Pritchard and Ruiz intended to cause or recklessly or consciously disregarded the probability of causing emotional distress to Plaintiff.

45. Plaintiff suffered severe or extreme emotional distress.

46. The conduct of Defendants Pritchard and Ruiz actually and proximately caused Plaintiff's emotional distress.

## COUNT IV

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### AGAINST DEFENDANTS PRITCHARD AND RUIZ

47. Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

772818.1

12

48.   Defendants Pritchard and Ruiz owed Plaintiff a duty of care not to provide false information to the Morton Grove Police Department that had the likelihood of causing harm to Plaintiff; the harm caused to Plaintiff was virtual banishment from Austin Park and the loss of his livelihood as a Chicago Public Schools vender; the burden of guarding against providing false information against Plaintiff to the Morton Grove Police Department.

49.   Defendants Pritchard and Ruiz breached the duty of care by providing false information about Plaintiff to the Morton Grove Police Department.

50.   By providing information to the Morton Grove Police Department about Plaintiff with reckless disregard to the truth of the information provided, and that the information contributed to Plaintiff's virtual banishment from Austin Park and the loss of his livelihood as a Chicago Public Schools vender, the negligence of defendants Pritchard and Ruiz was a proximate cause of Plaintiff's emotional distress.

51.   Plaintiff suffered an immediate or instinctive emotional response which was severe or extreme and a long lasting traumatic neurosis which was severe and extreme, to wit., a fear of interacting with members of the law enforcement community, a fear of being out in public, a fear of interacting with children, etc.

**COUNT V**

**FEDERAL CONSTITUTIONAL VIOLATIONS AGAINST**
**DEFENDANTS PRITCHARD AND RUIZ**

52. Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

53. Defendants committed the above described actions and/or omissions and substantially deprived Plaintiff of his clearly established rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. § 1983, and deprived plaintiff of the rights guaranteed to him under the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, including but not limited to:

a. freedom from unlawful arrest and seizure of his/her person;

b. freedom from abuse of process;

c. freedom from deprivation of liberty and property without due process of law;

d. freedom from retaliation for Plaintiff's exercise of his rights to free speech and assembly;

54. As a direct and proximate result of the acts and omissions of Defendants Pritchard and Ruiz, Plaintiff's constitutional rights were violated and Plaintiff was injured and sustained substantial injuries.

772818.1

14

55. The actions and/or omissions of Defendants Pritchard and Ruiz, complained herein were unlawful, conscience shocking, unconstitutional, and performed maliciously, recklessly, fraudulently, intentionally, willfully, wantonly in bad faith, and in such a manner to entitle Plaintiff to a substantial award of punitive damages against Defendants Pritchard and Ruiz.

**COUNT VI**

**RESPONDEAT SUPERIOR LIABILITY OF DEFENDANT
MAINE-NILES FOR STATE LAW VIOLATIONS**

56. Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

57. The conduct of the individual defendants alleged herein, occurred during the course and scope of their duties and functions, and/or while they were acting as agents and employees of the Defendant Maine-Niles, and, as a result, the Defendant Maine-Niles is liable to Plaintiff pursuant to the common law doctrine of respondeat superior.

58. As a result of the foregoing, Plaintiff was deprived of his liberty and property, experienced injury, pain and suffering, emotional injury, costs and expenses, and was otherwise damaged and injured.

**COUNT VII**

**PENDENT CLAIM OF NEGLIGENT HIRING, TRAINING,
AND SUPERVISION AGAINST DEFENDANT MAINE-NILES**

59. Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

60. At all times herein, Defendant Maine-Niles has been grossly negligent and negligent in the hiring supervision, training, and monitoring of its representatives.

61. At all times relevant herein, Defendant Maine-Niles has been grossly negligent and negligent in hiring, supervision, training, and monitoring of Defendants Pritchard and Ruiz.

62. As a direct and proximate result of the Defendant Maine-Nile's wrongful acts, policies, practices, customs and/or usages complained of herein, Plaintiff suffered injuries and damages including, but not limited to, emotional pain and suffering, anxiety, and embarrassment.

**COUNT VIII**

**STATE LAW TORTS AGAINST DEFENDANTS
PRITCHARD AND RUIZ**

63. Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

64. The acts, omissions, and conduct of Defendants Pritchard and Ruiz constitute defamation, false light, false arrest, false

772818.1

16

imprisonment, malicious prosecution, abuse of process, intentional infliction of emotional distress, and negligence infliction of emotional distress.

58. As a direct and proximate result of the aforementioned acts and omissions of Defendants Ruiz and Pritchard, Plaintiff has been injured and damaged.

## **DAMAGES**

66. Plaintiff hereby incorporates, in their entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

67. As a direct and proximate result of the aforementioned actions and omissions of the defendants, the Plaintiff was injured and damaged. The damages for which the Plaintiff seeks compensation from the defendants, both jointly and severally, include, but are not limited to, the following:

      a.   compensatory damages;

      b.   punitive damages;

      c.   The convening and empaneling of a jury to consider the merits of the claims herein;

      d.   Costs and interest and attorney's fees;

      e.   declaratory judgment and injunctive relief holding that the policies, practices or customs of Defendant Maine-Niles and Defendants Pritchard and Ruiz complained of herein are illegal and unconstitutional;

772818.1

f.  all such relief, both general and specific, to which Plaintiff may be entitled to under the premises.

## PRAYERS FOR RELIEF

68. Plaintiff hereby incorporates, in its entirety, each and every paragraph contained in this Complaint and by reference makes said paragraphs a part hereof as if fully set forth herein.

69. **WHEREFORE**, Plaintiff sues the defendants both jointly and severally, for his personal injuries and prays for a judgment against the defendants for compensatory damages solely in an amount to be determined by a jury as reasonable and for all such further relief, both general and specific, to which he may be entitled under the premises.

**WHEREFORE,** Plaintiff sues Defendants Pritchard, Ruiz, and Maine-Niles for punitive damages in an amount solely to be determined by a jury as reasonable and for all such further relief, both general and specific, to which he may be entitled under the premises.

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: February 20, 2019  By: */s/ Steven S. Glickman*
Steven S. Glickman, Esq.
(admitted *Pro Hac Vice)*
**LITE DEPALMA GREENBERG, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 877-3823
sglickman@litedepalma.com
*Attorneys for Plaintiff*

772818.1

18

# EXHIBIT A

MORTON GROVE
POLICE
REPORT COPY

## Officer: J. Walsh, Case Narrative

**Offender: Glickman, Jacob R (M/W 08/19/85)**

**CQH** ▓▓▓▓▓

**Complainant 1: Ruiz, Lauren C (F/W 04/06/82)**

**Complainant 2: Pritchard, Blaire E (F/W 09/13/94)**

On 07/20/17 I was dispatched to Austin Park, 8336 Marmora, for a suspicious subject. Upon my arrival, I met with Complainant 2 Blaire PRITCHARD who related the following in summary:

PRITCHARD stated she is site director for a children's camp for autistic children hosted at Austin park on week days between the hours of 12 noon and 6pm. PRITCHARD pointed to the offender, GLICKMAN, who was standing at the time in the large field with two unknown juvenile females. GLICKMAN had a small dog with him that was not leashed. PRITCHARD stated GLICKMAN had been acting very suspiciously for the past week and half and wanted the notify the police.

As I approached GLICKMAN, the two juveniles left the scene. I asked GLICKMAN if he knew the two juveniles and he stated, "no they were just playing with my dog." When I began to question GLICKMAN, he acted very nervous and continued to asked if he was in trouble. GLICKMAN stated the camp staff never spoke to him, but changed his story several times. GLICKMAN was insisting that he did nothing wrong and was just walking his dog at the park. While on scene, GLICKMAN was cited for not having his dog on a leash and was warned to stay away from the campers.

After GLICKMAN left the area on foot, PRITCHARD added that she witnessed GLICKMAN taking photographs in the direction of the two female juveniles that were with GLICKMAN when I approached him.

At this time, I left the park and was able to catch up to GLICKMAN close to his residence at ▓▓▓▓▓▓▓ I advised GLICKMAN of the accusations against him and he replied he only took pictures of his dog. I then asked for consent to see his phone to view the pictures of his dog. GLICKMAN replied he did not want to do anything without first speaking to his lawyer. GLICKMAN walked away and entered his condominium building.

I went back to the park to speak with PRITCHARD and the director of the camp, RUIZ who had just arrived on scene. PRITCHARD began to describe the situation in more detail. PRITCHARD related the following:

PRITCHARD stated it all started early last week, possibly Tuesday 07/11/17 at approximately 1600hrs. The campers were on a nature walk around the park when they first encountered GLICKMAN and his dog. PRITCHARD stated some of the campers just ran up to the unleashed dog and started a conversation with GLICKMAN. GLICKMAN told the campers information about himself and the dog. PRITCHARD stated GLICKMAN remained in the area and continued to initiate conversations with some of the campers. At approximately 1645hrs, one of the handicapped campers became nervous and struck the dog. PRITCHARD intervened and separated the campers from GLICKMAN. PRITCHARD stated that GLICKMAN did keep his distance, but stayed in the area.

On 07/13/17, PRITCHARD stated she observed GLICKMAN in the park again and was letting the unleashed dog run towards the campers. PRITCHARD stated her attention was elsewhere when she observed a camper, who was separated from the group, holding the dog and talking with GLICKMAN. PRITCHARD went over and intervened again, separating GLICKMAN from the campers. PRITCHARD explained to the camper not to walk up to strangers and speak with them.

On 07/14/17, PRITCHARD again observed GLICKMAN and the dog in the park near the merry- go- round and volleyball court. PRITCHARD stated GLICKMAN regularly stayed at the park for hours not really doing anything. PRITCHARD stated she had witnessed other children, not involved in the camp, approach GLICKMAN and his dog.

ON 07/18/17, PRITCHARD again observed GLICKMAN and his dog at the park close to the campers. PRITCHARD observed one of the campers running by GLICKMAN and he attempted to stop the juvenile so that the juvenile would play with his dog. PRITCHARD again intervened and asked why the dog was not on a leash. GLICKMAN stated he was trying to train the dog. PRITCHARD again explained the campers' disabilities to GLICKMAN and asked if he could keep the dog away from them. GLICKMAN replied: "The kids just need to get used to the dog."

On 07/19/17, at approximately 1630hrs, Camp staff observed GLICKMAN and his dog approaching some of the campers and calling out to them by their names. PRITCHARD also stated that GLICKMAN was asking camp staff about certain campers and their medical conditions. PRITCHARD approached GLICKMAN and explained to him that one of the things the camp was teaching the children was not to talk to strangers. She further explained his actions of walking up to them and talking to them was



MORTON GROVE
POLICE

counter productive and PRITCHARD also told him that some of the children were allergic to dogs. GLICKMAN's tone of speech became argumentative and stated that his dog was hypoallergenic and the kids would be fine. PRITCHARD ended the conversation by once again asking GLICKMAN to stay away from the campers and the staff. PRITCHARD handed him RUIZ's business card and advised him to contact her if he had any questions.

On 07/20/17, GLICKMAN and his dog again were in the area near the volleyball court. GLICKMAN again let the unleashed dog run to the playground area and initiated a conversation with camp staff. PRITCHARD was notified of this and again confronted GLICKMAN. GLICKMAN stated he worked with kids who had disabilities and that PRITCHARD was wrong not to let the children play with animals. At this point, PRITCHARD contacted RUIZ, who was not on scene, who subsequently dialed 911.

RUIZ and PRITCHARD stated they were very nervous and disturbed about GLICKMAN's actions and wanted to sign complaints. I spoke with Sgt Warrensford and he advised me to try to make contact with GLICKMAN at his residence to take him into custody for disorderly conduct. When I arrived at ███████████ CSO Platz advised that GLICKMAN was in the lobby of the Police station. I responded to the station where GLICKMAN was taken into custody for misdemeanor disorderly conduct. GLICKMAN invoked his rights and refused to provide a statement. GLICKMAN was processed and released on bond.

Per my request, Officer Mallaney issued a track flyer for information only purposes regarding the incident.

## OfficerID: twalsh, Arrest Narrative

**See Case Report**

# EXHIBIT B

Recreation Specialist
Safety Coordinator
Superintendent
  (Please initial and date)

**FORM
# 5**

# M*NASR

Metro-Nites Association of Special Recreation

# Documentation Form

Date: 7/13/17     Participant's Name: ▬▬▬▬▬     Subject Matter: Dog Man Suspicious

Staff Name: ▬▬▬▬▬     Title: SD

INCIDENT:

-7/13 First encounter/introduced himself + told us age/name so age

-7/14: dog man returned and was hanging out around the merry-go-round. Asked about camp/camp names and the organization in general

-7/17: dog man returned and continued watching the campers

-7/18: same as above

-7/19: gave dog man Lauren's card and explained that we needed his cooperation with keeping his distance from our campers

-7/20: dog man first approached the campers + rose by the merry-go-round. He started asking questions about camp hours etc then he approached me and was very confrontational and argued why he was supposed to keep his distance from campers and that he didn't agree with it

# EXHIBIT C

Recreation Specialist _____
Safety Coordinator _____ 7/28/17
Superintendent _____
(Please initial and date)

**FORM # 5**

## M·NASR
Maine-Niles Association of Special Recreation

# Documentation Form

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Date: 7/20/17    Participant's Name:    N/A    Subject Matter: Suspicious community member

Staff Name: ████████                    Title:  Program Manager

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

INCIDENT: On 7/18/17, Site Director ████████ spoke to me about a suspicious community member that has been consistently hanging around our Quest to Shine/Sun Setters camps at Austin Park in Morton Grove. Blaire said the first interaction was Monday or Tuesday the week of 7/10, when the man was at the park with his puppy who was not leashed. Our camp group was going for a nature walk around the park, and our campers saw the puppy and were excited to approach it. The man was friendly at this time.

Every day of camp since this first interaction, the man had continued to approach our camp staff and campers with his unleashed dog, with his behaviors becoming more suspicious and inappropriate. Examples: asking our campers' names, asking what types of disabilities our campers have, asking how old our campers are, brushing up against one of our campers, and grabbing one of our campers as he was running past him. I advised ████ to approach the man if he returned on 7/19, to explain to him that we have to be very protective of our campers and that they will no longer be able to interact with him and his dog. I also advised her to give him my card and encourage him to contact me with any questions about M·NASR.

The man did show up to the park again and approached our camp on 7/19, and ████ spoke with him, telling him that some of our campers have allergies so could not be around his dog, that we try to teach our campers not to talk to strangers so the situation has become confusing for them, and that they are no longer able to visit with him and his dog. The man became immediately defensive, saying his dog is hypoallergenic so there should not be concerns about the allergies, that he could work with our campers to try to help them learn about dogs, that he has a right to be in the park whenever he wants, etc. He did take my card

2/21/14 (Revised) MNASR Documentation Form (no lines)

and left upset. ███ lso reported that on 7/19, while one of our male campers was laying on the park bench without his shirt on before the pool, a drone was overhead and hovering over him. While she could not say if this drone belonged to the man with the dog, the man was at the park at the time.

I reported the incident to ███████████ Deputy Chief of Field and Support Services of the MGPD to get advice and make him aware of the incidents. He said it was good that we had told the man not to come near us anymore, and he encouraged us to call 911 if the man approached our group again.

On 7/20, ███ contacted me at approximately 3:45pm and said the man had arrived at the park and immediately went up to our group asking additional intrusive questions about our camp with an angry tone of voice. He had then approached ███ and was verbally aggressive, telling her he lives close by so is going to continue to be at the park, can talk to anyone he wants, and again stating his dog is hypoallergenic, that he works with kids with disabilities also so he is fine to be around our group, etc. I told ███ to immediately bring everyone inside the field house and that I was coming there in addition to calling 911.

I called 911 on my way to Austin Park and reported the man's behaviors. By the time I arrived there, the police were already speaking with the man across the field. I spoke with ███ again who was visibly upset, and she let me know that the man had also been speaking with 2 young girls just before the police arrived, and was taking pictures of them on his cell phone. I asked her to keep everyone inside, and I waited on the basketball court to speak with the police officers after they were done speaking with the man. The man walked away after speaking with the officers, and they approached me. I shared with them the additional details that ███ had told me about, my concerns for our campers and staff, and the interaction ███ mentioned with the young girls and the photos. They said they would be going to speak with the man again about that situation, and that they had ticketed him for the dog being unleashed. They stated they knew his full name and exactly where he lives, and they had "put the fear of God in him" about interacting again with our campers. They asked us to keep them updated about any other suspicious behavior.

About 15 minutes later as I was on my way back to the office, ███ called again and put one of the officers on the phone who had come back to camp. He let me know that the man had refused to show them his phone when they asked him about the photos, and that they had enough information now to arrest him for disorderly conduct. He asked for my personal info and if I'd like to make a complaint so the man would be arrested and I said yes. He let me know that he would call back later and let me know when I should come

to the police station to sign the complaint. When they called back at approximately 5:30pm, they let me know that the man had posted bail.

████ nd I both went to the police station, and they requested her name on the complaint as well since she was the actual witness to the situations. They had her retell them about each interaction and noted all additional details. They told us the man had received 3 small citations related to his dog, and was also charged with disorderly conduct. We received a copy of the complaint, including details about a court date. They encouraged both of us to go, but more importantly ████ since she is the witness. I again expressed my concerns about our campers and staff being safe. They let us know that their hands are tied at this time, and to continue contacting 911 if needed. They can't prevent the man from going to the park or even talking to us, but if he says anything inappropriate or is bothering us, to call them.

████ or ██ will be present at Austin Park throughout the entire time that our group is there today, 7/21/17.

2/21/14 (Revised) MNASR Documentation Form (no lines)

# EXHIBIT D

Recreation Specialist _____ 3∨     week
Safety Coordinator _____
Superintendent _____              7/10 - 7/14
(Please initial and date)

# M★NASR
Mote Nate Association of Special Recreation

# Documentation Form

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Date: 7/20/17   Participant's Name: _____   Subject Matter: SUSPICIOUS Man

Staff Name: _____   Title: Camp Counselor

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

INCIDE

Rose. I was sitting on the merry go round with my ramper.
The man was at the park with his dog. The dog kept
coming over to the merry go round and he said "we
can't go over here since." Later he asked me "what time
can I actually bring my dog in the park?" I told him that
we are done at 6:00 pm and that we are here at 11:30 am.
He then asked me what the name of the program was. I then
told him that I cannot talk about it and told him
to talk to my boss. Then he went over to Blaire Pritchard.

2/21/14 (Revised) MNASR Documentation Form

# EXHIBIT E

1   STATE OF ILLINOIS   )
                  )  SS:
2   COUNTY OF C O O K  )

3      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

4    MUNICIPAL DEPARTMENT - SECOND MUNICIPAL DISTRICT

5   THE PEOPLE OF THE STATE OF   )

6   ILLINOIS,                  )

7        Plaintiff,       )

8     vs.                 ) No. 17 MC2 1538

9   JACOB GLICKMAN,        )

10        Defendant.       )

11        REPORT OF PROCEEDINGS had at the hearing

12   in the above-entitled cause before the Honorable

13   ALEKSANDRA GILLESPIE, Judge of said court, on the

14   19th day of March, 2018.

15        APPEARANCES:

16        MS. KIMBERLY M. FOXX,
            State's Attorney of Cook County, by:
17        MS. EDITH RIOS,
            Assistant State's Attorney,
18             appeared on behalf of the People;

19        MR. STEVEN GREENBERG,
            appeared on behalf of the Defendant.
20

21

22

23   AMANDA REDINGER
    Official Court Reporter
24   License No. 084-004613

1

1                      I  N  D  E  X

2    People vs. Jacob Glickman
     No. 17 MC2 1538
3
     DATE:  3-19-18
4    PAGES:  1 - 25
     REPORTED BY:  Amanda Redinger
5
                       BENCH TRIAL
6

7    WITNESSES              Direct  Cross  Redirect  Recross

8    For the State

9    Blair Pritchard        6       14

10
     Exhibits:  (None)
11

12   Reporter's Certificate - P. 25

13

14

15

16

17

18

19

20

21

22

23

24

1  July 20, 2017?

2      MR. GREENBERG:  Objection, Judge.  It's a

3  public park.

4      THE COURT:  You can answer if you understand

5  the question.

6      THE WITNESS:  I do.

7          So, no, I did not invite him.  And, yes, I

8  understand it's a public park, but I just asked

9  that he keep his dog at least away.  So that wasn't

10  why he kept coming back to our campers and talking

11  to them.

12  BY MS. RIOS:

13      Q.   And did you give the defendant permission

14  to engage with the children?

15      A.   No.  I actually asked that he could just

16  keep his space.

17      MS. RIOS:  One moment, your Honor.

18      Q.   And after this incident, what did you do?

19      A.   We called the police about 3:30 on the

20  20th.  And at that point, I took all my campers and

21  counselors inside the field house.  And the man

22  walked away and then started engaging with two

23  other girls who were not in our camp.

24      Q.   And the man -- by the man, do you mean the