**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JACOB R. GLICKMAN,         )
                                )
          **Plaintiff,**    )
                                )     **No. 18 C 4907**
      **v.**                  )
                                )     **Judge Rebecca R. Pallmeyer**
BLAIRE E. PRITCHARD     )
and LAUREN C. RUIZ,      )
                                )
         **Defendants.**   )

### MEMORANDUM OPINION AND ORDER

In July 2017, Plaintiff Jacob Glickman took his puppy to a small park near his house, where he had several interactions with staff and participants in a camp for children with disabilities, run by the Maine-Niles Association of Special Recreation ("M-NASR"). That summer, Defendant Blaire Pritchard was the site director for M-NASR at the park, and Defendant Lauren Ruiz was M-NASR's program manager. Concerned that Glickman was harassing camp staff and endangering campers, Defendants called the police, reported several allegations, and signed a criminal complaint. Glickman, whose criminal conviction stemming from those allegations was later overturned, sued Defendants alleging they violated 42 U.S.C. § 1983 by depriving him of his Fourth Amendment right to be free from unreasonable arrest or unreasonable seizure [38]. Now pending before the court is Defendants' motion for summary judgment [104] on that claim. For the reasons stated herein, the motion is granted in part and denied in part.

### BACKGROUND

During the summer of 2017, Plaintiff Jacob R. Glickman lived in Morton Grove, Illinois, about one block from Austin Park. (Pl.'s Additional Statement of Facts [111] (hereinafter "Pl.'s Additional SOF") ¶ 2; Defs.' Statement of Facts [106] (hereinafter "SOF") ¶ 6.) On several occasions that summer, Glickman took his three-month old puppy—a small Shih Tzu named Ernie—to Austin Park, which the parties agree is a "dog-friendly" park. (Pl.'s Additional SOF ¶ 1-

2; SOF ¶ 7, 10; Pritchard Tr., Ex. A to SOF [106-1] (hereinafter "Pritchard Tr.") at 36:17-25.)  The harness Glickman purchased for Ernie was the wrong size, and because it did not fit correctly, Glickman occasionally allowed Ernie to play off leash at the park.  (Pl.'s Additional SOF ¶ 1; Defs.' Resp. to Pl.'s Additional SOF [117] ¶ 1.)  It is a violation of a Morton Grove Park District ordinance to let your dog off leash at Austin Park.  (SOF ¶ 20; *see* Morton Grove Park District Ordinance No. O-01-17, https://mortongroveparks.com/dogs-now-allowed-mgpd-parks (last visited Mar. 9, 2022.)  Glickman was unaware that having Ernie off leash at the park was prohibited.  (Glickman Tr., Ex. D to Defs.' SOF [106-4] (hereinafter "Glickman Tr.") at 84:22-24.)

That summer, the Maine-Niles Association of Special Recreation (M-NASR) ran day camps in Austin Park for 15 to 18 children with various physical and intellectual disabilities, including autism and Down syndrome.  (SOF ¶ 3, 8, 9; Pl.'s Resp. to Defs.' SOF [110] ¶ 9.)  M-NASR is an extension of several different Illinois park districts, and as such is a public entity employing public officials.  *About Us*, Maine-Niles Association of Special Recreation, http://mnasr.org/about (last visited Mar. 9, 2022).  Defendant Blaire Pritchard was the Site Director for M-NASR, which meant that she was the most senior employee for the organization at Austin Park.  (SOF ¶ 4.)  She was in charge of planning and setting up weekly activities, as well as pairing campers with counselors depending on each camper's individual needs.  (Pritchard Tr. at 10:6-13.)  M-NASR employed a sufficient number of counselors so that each could generally pair with a camper "one-on-one."  (*Id.* at 11:17-18.)  Defendant Lauren Ruiz, the Program Manager for M-NASR, was Pritchard's supervisor.  (SOF ¶ 5.)  Ruiz was not present at Austin Park during the period in which Glickman interacted with the camp.  (*Id.* ¶ 62.)

In July 2017, Glickman and his puppy encountered M-NASR campers and counselors at Austin Park several times.  Pritchard testified that the parties interacted "pretty much . . . every weekday" between July 10 and July 20 (Pritchard Tr. at 29:7-8), whereas Glickman estimated that he interacted with the camp just three to four times.  (Glickman Tr. at 91:16-92:1.)  As set forth below, the details of these encounters are heavily disputed.

A.     **The Parties' Initial Alleged Interactions at Austin Park**

1.     **A camper punching Ernie**

On a date between July 10 and July 20, Pritchard and the rest of the M-NASR camp went on a "nature walk," which involved campers walking through Austin Park in a single-file line alongside their counselors.  (SOF ¶ 13.)  At one point, the campers came upon Glickman and Ernie.  According to Glickman, the children ran up to Ernie and "became excited by the puppy." (Pl.'s Resp. to Defs.' SOF ¶ 13.)  In Defendants' account of this episode, "Glickman appeared with his dog and introduced himself, causing the children to become excited."  (SOF ¶ 13.)  It is not clear from the record whether it was Glickman or the campers who initiated the interaction; Pritchard testified that the campers "ran into [Glickman], and he started talking to, you know, the front of the line, introduced himself" (Pritchard Tr. at 17:5-8), but she later conceded that she was "not specifically sure if [the campers] all ran up to [Glickman] or how that transpired."  (*Id.* at 230:7-23.)  Regardless, as Pritchard testified and Glickman admits, "one of [the] campers who actually doesn't like dogs went up and kind of punched the dog, and then, you know, we separated the kids and just continued on our walk and apologized to Mr. Glickman and continued on."  (*Id.* at 17:9-13; Pl.'s Resp. to Defs.' SOF ¶ 13.)  Pritchard, who observed the punch "from afar," testified that the camper, who reportedly had autism, had "screamed," "[s]wung his arm," and "struck the dog."  (Pritchard Tr. at 18:7-19:13.)  Following the altercation, Pritchard moved to the front of the line and apologized to Glickman.  (*Id.* at 20:8-11.)  According to Pritchard, her interaction with Glickman spanned "maybe five seconds."  (*Id.* at 20:16-18.)

2.     **Glickman allegedly talking to campers**

Pritchard testified that the next incident occurred "[p]robably the next day," though she was "not 100 percent certain," since "[t]here were multiple days that [Glickman] was around, kind of distracting [the] campers, talking with them, but then there were incidents later on that [she] more vividly remember[s]."  (Pritchard Tr. at 24:14-22.)  Glickman denies that any incident occurred on the day following the nature walk.  (Pl.'s Resp. to Defs.' SOF ¶ 14.)  Pritchard

3

admitted that, "with it being three years ago," she does not "recall specifically the days of what exactly transpired," and that she ultimately could not say whether Glickman had any interaction with the campers the day after the punch incident.  (Pritchard Tr. at 27:16-20, 28:24-29:3.)

Regardless of the precise date, at some point between July 10 and 20, Pritchard testified that Glickman was talking with an older female camper who was "maybe ten feet away from the rest of the camp."  (Pritchard Tr. at 31:3-18.)  When Pritchard saw this, she went over, pulled the girl away, and "had a conversation with her about . . . being safe at camp . . . and explaining that that's not a situation that, you know, she should be getting into."  (*Id.*)  Glickman admits to speaking with a female camper, though he does not recall the conversation, and he notes, without more specifics, that "there was certainly a counselor within the area."  (Glickman Tr. at 95:7-96:3.)

According to Pritchard, Glickman was also "starting to approach counselors and approach campers . . . and just asking intrusive questions."  (Pritchard Tr. at 25:11-15.)  Specifically, Pritchard said that Glickman was "continually approaching . . . campers and . . . staff, asking questions about [the campers'] disabilities, their age, their names, and that was definitely alarming."  (*Id.* at 24:4-8.)  Glickman's recollection differs.  He testified that he asked camp counselors "generally" about the campers' disabilities, but "never asked them for any specificity or particularity."  (Glickman Tr. at 97:2-7.)  He testified that he never asked a camper or a counselor about a specific camper's age, though he "generally . . . could have asked [a camp counselor] what the age range of the campers were."  (*Id.* at 98:8-11.)  And he testified that he never asked any campers for their names, never asked any counselors for the name of a camper, and never called any campers by their name.  (*Id.* at 96:4-12.)

That last item—calling a camper by their name—is the subject of a specific disputed incident.  Pritchard testified that, on an unknown date during the 10-day period, a camp counselor, Hillary Simon, reported to Pritchard that the camper Simon was assigned to work with was petting Ernie when Glickman addressed the camper by name and told him "[g]ood job."  (Pritchard Tr. at 37:1-10.)  In her testimony about this incident, Pritchard again used the word "alarming" with

4

reference to Glickman's knowledge and use of a camper's name.  (*Id.* at 37:8.)  Glickman specifically denied that Pritchard's hearsay account of these events ever happened.  (Glickman Tr. at 96:10-19.)  Simon herself testified that after her camper petted the dog, *she* was the one who said "'[g]ood job' and used [her] camper's name."  (Simon Dep., Ex. 1 to Pl.'s Additional SOF [111-1] (hereinafter "Simon Dep.") at 19:6-12.)  Simon further testified that *after* she had stated the camper's name, Glickman said "'[t]hank you,' used the camper's name, 'for petting my dog.'" (*Id.*)  Simon later testified that she did not feel that Glickman acted inappropriately during this exchange, but just that it gave her a "funny feeling."  (*Id.* at 40:15-25.)

### 3.     Glickman allegedly touching a camper

Pritchard also testified that "there was another situation that occurred where one of [the] campers [was] running by Glickman and he, in some capacity, touched the camper or stuck his arm out, and that was reported to [Pritchard] by one of the counselors."  (Pritchard Tr. at 32:11-15.)  Pritchard stated that she thought the counselor who reported this to her was Hillary Simon, and that the camper who Glickman allegedly touched was the same boy Glickman had allegedly called by name.  (*Id.* at 37:11-38:13.)  Glickman "denies that any such incident occurred."  (Pl.'s Resp. to Defs.' SOF ¶ 17.)  Simon, who confirmed that the boy Pritchard referenced was her assigned camper (Simon Dep. at 19:13-17), testified that she never witnessed an incident where a camper brushed up against Glickman or an incident where Glickman had inappropriate physical contact of any kind with a camper.  (*Id.* at 34:4-17.)

### 4.     Glickman allegedly watching the campers

Pritchard testified that certain unspecified counselors informed her (on an unspecified date) that Glickman was "sitting, standing, watching campers, looking at [the] campers, in the[ir] general direction," which she thought "was a little unusual."  (Pritchard Tr. at 171:21-172:12, 173:23-24.)  Though Pritchard offered this hearsay account, she later testified that she actually had no idea what Glickman was looking at.  (*Id.* at 174:8-10.)  Defendants offer no other evidence

for the assertion that Glickman was watching campers.  (*See* SOF ¶ 18.) Glickman denies having done so.  (Pl.'s Resp. to Defs.' SOF ¶ 18.)

### 5.    Glickman allegedly flying a drone over a camper

Pritchard testified that on an unspecified date, Simon reported to her that there was "a drone that was hovering over one of [the] campers who didn't have a shirt on."  (Pritchard Tr. at 29:18-20, 93:18.)  Pritchard admitted that the camp staff were not sure "who [the drone] belonged to," and that she had never seen Glickman with a drone or a remote control.  (*Id.* at 70:24-71:10, 72:7-8.)  In her July 18 report to Ruiz about Glickman (discussed below), Pritchard stated that the drone "was potentially related but also potentially not related" to Glickman.  (*Id.* at 72:9-22.)

Glickman testified that he had never operated a drone, had nothing to do with any drone at Austin Park, and never saw a camper with his shirt off.  (Glickman Tr. at 129:15-130:2.)  Simon's testimony is consistent with Glickman's: she testified that she expressed concern to Pritchard about Glickman in the context of "the drone situation," but admitted that hearing other camp staff talk about Glickman in a derogatory fashion may have influenced her opinion that Glickman was involved with the drone.  (Simon Dep. at 36:4-18; *see id.* at 11:7-13; Zubeck Dep., Ex. 5 to Pl.'s Additional SOF [111-5] (hereinafter "Zubeck Dep.") at 55:14-20 (agreeing that camp staff frequently spoke about Glickman in a derogatory manner before and after the arrest.))  She further acknowledged that in retrospect, it could have been someone innocently flying a drone above the park, and it may have had nothing to do with the shirtless camper.  (*Id.* at 36:19-37:1.)

### 6.    Pritchard's report to Ruiz and subsequent interaction with Glickman

On July 18, Pritchard spoke to her supervisor, Defendant Ruiz, about her concerns regarding Glickman.[1]  Ruiz documented this conversation on July 20, recounting what she learned

---

[1]    From the evidence in the record, this appears to be the first instance in which Pritchard talked to Ruiz about Glickman.  Pritchard, however, when asked about this directly during her deposition, stated she was "not for sure that it was the first time," and that she thought she might have mentioned something about Glickman to Ruiz earlier.  (Pritchard Tr. at 189:18-25.)

from Pritchard. Ruiz wrote that "the first interaction" between the camp and Glickman was when the campers saw Ernie during the nature walk; Glickman "was friendly at this time." (Ruiz Report, Ex. 8 to Pl.'s Additional SOF [111-8] (hereinafter "Ruiz Report") at 1.) Ruiz noted further, however, that "[e]very day of camp since this first interaction," Glickman continued to approach campers and counselors, with "his behaviors becoming more suspicious and inappropriate." (*Id.*) Ruiz specifically documented the following behaviors: asking campers' names, asking what types of disabilities the campers had, asking the campers' ages, brushing up against one of the campers, and grabbing one of the campers as he was running past. (*Id.*) Ruiz wrote that she

> advised Blaire [Pritchard] to approach the man if he returned on 7/19, to explain to him that we have to be very protective of our campers and that they will no longer be able to interact with him and his dog. I also advised her to give him my card and encourage him to contact me with any questions about M-NASR.

(*Id.*)

Pritchard testified that the following day, on July 19, she approached Glickman in the park and asked that he not "engage with" or "distract" the campers, and that he help "ensure the safety" of the campers, noting that some of the children had allergies. (Pritchard Tr. at 39:21-40:11.) Pritchard testified that Glickman told her Ernie was hypoallergenic, and that Pritchard "was in the wrong for trying to not let the campers engage" with Glickman. (*Id.* at 40:5-15.) Pritchard testified that she gave Glickman Ruiz's card, and told him: "Any further questions, you can refer to her, but we would really just like your cooperation." (*Id.* at 41:1-4.) According to Pritchard, Glickman "was pretty defensive about that." (*Id.*)

Glickman denies this account. He testified that this July 19 conversation did not involve Pritchard, but was instead between himself and Grace Spiewak, Pritchard's assistant site director. (Glickman Tr. at 112:15-19; *see* Pritchard Tr. at 62:9-13.) Glickman testified that Spiewak approached him on July 19th while he was letting Ernie play with another dog owned by a woman named Dawn (not affiliated with M-NASR). (Glickman Tr. at 113:4-8.) Glickman stated that Spiewak "was basically saying some of the kids had an allergic reaction previously, so [Glickman]

7

said [his] dog is hypoallergenic." (*Id.* at 113:9-13.) He testified further that Spiewak "asked if we can create separation between the dog and the campers," and he responded saying that whatever had happened previously involving allergic reactions "wasn't [his] dog, [his] dog is hypoallergenic." (*Id.* at 114:3-15.) Glickman testified that it was Spiewak who gave Ruiz's card to him and told him to call Ruiz if he wanted to speak with a supervisor. (*Id.* at 114:8-115:17.) Glickman never called Ruiz. (SOF ¶ 34.)

### 7. Glickman's interactions with camp staff on July 20, 2017

The next day—after Glickman spoke with either Pritchard (as Defendants assert) or Spiewak (as Plaintiff asserts)—Glickman returned to the park. Glickman testified that prior to coming, he asked someone at "the community center" about the camp's hours and was told "the hours were until 3:00 o'clock." (Glickman Tr. at 122:11-16.) Glickman testified that he went to the park around 3:30 pm, assuming the campers would be gone. (*Id.* at 119:23-24, 122:15-20.) In fact, however, the camp was still in session, and Ernie—presumably unleashed—wandered towards a merry-go-round where a camper was playing under the supervision of counselor Rose Zubeck. (Zubeck Report, Ex. 7 to Pl.'s Additional SOF [111-7] (hereinafter "Zubeck Report") at 1; Zubeck Dep. at 28:1-4; Glickman Tr. at 119:23-120:9.) Glickman asked Zubeck about the camp's hours—seeking to find out when he would be free to bring his dog to the park—and Zubeck told him the camp ended at 6:00 pm. (Zubeck Report at 1; Glickman Tr. at 120:10-11.) Glickman then asked for the name of the camp, and Zubeck responded that she could not say and that Glickman should talk to Pritchard. (Zubeck Report at 1; Glickman Tr. at 121:19-122:5.)

As noted above, Glickman denied that Pritchard ever asked him to keep his distance from the camp (he claims that Spiewak made this request). After his interaction with Zubeck by the merry-go-round, however, Glickman does admit that he had a conversation with Pritchard in which Pritchard asked him to keep his distance from the one camper who had previously punched Ernie. (Glickman Tr. at 118:3-22.) Glickman testified that during this interaction, he asked Pritchard if he could stay at the park, and Pritchard agreed "so long as [he] stay[ed] away from this one kid."

(*Id.* at 109:8-15.)  Glickman acknowledged that during an unspecified conversation between himself and either Pritchard or Spiewak (possibly referring to this conversation), he became upset—though he stated that he did not raise his voice or use an aggressive tone.  (*Id.* at 118:23-119:4.)  He also acknowledged that in one of these conversations he said words "to the effect" of "[he] had a right to be in the park whenever [he] wanted."  (*Id.* at 119:5-8.)  Glickman does not agree with Defendants' assertion that he was "defensive."  (Pl.'s Resp. to Defs.' SOF ¶ 18.)

## B.      Ruiz's 911 Call

Immediately after Pritchard spoke with Glickman on July 20, Pritchard called Ruiz and reported that Glickman had returned to Austin Park, approached campers and counselors, and had "asked intrusive questions with an angry tone of voice."  (SOF ¶ 37.)  Ruiz told Pritchard to bring the children inside the "field house," a structure at one end of the park, and Pritchard did so.  (Ruiz Report at 2; Pritchard Tr. at 206:3-5, 11:1, 95:19-21.)  Ruiz discussed the matter with Suzanne Bear, then the executive director of M-NASR, and Jennifer Gebeck, the organization's superintendent of recreation.  (Ruiz Answers to Pl.'s Interrogs., Ex. 3 to SOF [106-3] (hereinafter "Ruiz Interrogs.") at 4-9.)  The three of them decided to contact the police; Ruiz dialed 911 and reported Glickman's conduct to a dispatcher while she drove to the park.  (*Id.* at 17; Ruiz Report at 2.)  In an interrogatory answer, Ruiz stated that she hoped the 911 call would stop Glickman from: using his phone to take pictures of campers; physically touching campers; letting his dog confuse a camper and cause the camper to punch the dog; calling campers by their names or otherwise acting overly familiar with them; asking camp staff about campers and their disabilities; and distracting campers and staff from participating in camp.  (Ruiz Interrogs. at 16-17.)  She also hoped the call would "prevent Plaintiff from actually or potentially harming the campers physically, psychologically or emotionally."  (*Id.* at 17.)

## C.      The Alleged Picture-Taking Incident

After the 911 call, but before any officers arrived, camp staff observed Glickman in the presence of two young girls—unaffiliated with M-NASR—who were playing with Ernie.  (SOF ¶ 40;

Pritchard Tr. at 95:19-96:5.)  Glickman testified that the girls were kicking a soccer ball and Ernie (unleashed) was playfully running into it.  (Glickman Tr. at 126:1-7.)  Glickman testified that he spoke with one of the girls who thought that she recognized him as a coach from one of the area schools.  (*Id.* at 126:14-127:18.)[2]  He testified that at one point, while the girls were playing with Ernie, he took a call from a friend on his cell phone.  (*Id.* at 128:1-7.)  However, Glickman said, he never took any photographs with his phone that afternoon.  (*Id.* at 128:8-19.)

Pritchard apparently viewed Glickman's interaction with the girls differently.  In a report she prepared the following week, on July 28, Ruiz wrote that when she arrived at Austin Park that day, she spoke with Pritchard "who was visibly upset, and [Pritchard] let [Ruiz] know that the man had also been speaking with 2 young girls just before the police arrived, and was taking pictures of them on his cell phone."  (Ruiz Report at 2.)  Pritchard testified that she did not personally witness the alleged picture-taking incident, but it was "something that had been brought up amongst counselors."  (Pritchard Tr. at 97:14-21.)  Pritchard also acknowledged, however, that "[n]o one ever said they for sure saw the pictures being taken," and admitted that no one had offered her any specific facts regarding Glickman and his phone that suggested he was photographing the girls.  (*Id.* at 128:24-129:12.)  Pritchard testified that the counselors who had brought this incident to her attention were Julia Sirvinskas[3] and Hillary Simon.  (*Id.* at 126:11-13.)  Simon's testimony contradicts Pritchard; according to Simon, Pritchard told her that *she* (Pritchard) had seen Glickman taking photographs of the girls.  (Simon Dep. at 13:5-15:5.)  Simon also testified that while she recalled personally seeing Glickman talking to the two girls, Simon did not recall seeing him photograph the girls or otherwise do anything that could be construed

---

[2]     Whether the girl was correct about this is not clear, but it appears Glickman had some involvement with the public schools; he has alleged that Defendants' conduct in this case caused him to lose "his livelihood as a Chicago Public Schools vendor."  (Pl.'s Second Am. Compl. [38] ¶¶ 48, 50.)

[3]     Neither party provided the court with testimony or an affidavit from Sirvinskas.

as photographing them. (*Id.* at 20:4-16.) She stated she merely recalled him "having his phone," and she was not sure whether she reported that fact to anyone. (*Id.*)

**D.     The Officers' First Conversation with Glickman**

Following Ruiz's 911 call, the police dispatcher told officers Timothy Walsh and Mark Atto that there was someone at Austin Park with a dog asking campers personal questions, and that the person had "brushed up against a camper yesterday, and he got verbal with the director today." (Walsh Tr., Ex. G to SOF [106-8] (hereinafter "Walsh Tr.") at 13:9-15; Atto Tr., Ex. F to SOF [106-7] (hereinafter "Atto Tr.") at 7:23-8:4.) The officers testified that after getting this call and arriving at the park, the first thing they did was speak with Pritchard. (Walsh Tr. at 14:12-17; Atto Tr. at 8:14-19.) The content of that conversation is not clear from the record. Walsh could not recall what was said, beyond Pritchard pointing out Glickman. (Walsh Tr. at 15:17-16:23.) Atto testified that "to the best that [he] can recollect," Pritchard told the officers that Glickman had been interacting with the children despite repeatedly being asked not to do so. (Atto Tr. at 9:1-14.) Pritchard herself could not "say for sure" what she told the police when they first arrived at the park, and actually thought that the first time she told the police about Glickman's conduct was later on, at the police station. (Pritchard Tr. at 121:10-13.)

After speaking with Pritchard, Walsh and Atto walked over to talk to Glickman. (SOF ¶ 40.) When the officers approached, the two girls who were playing with Ernie left. (Glickman Tr. at 128:20-23.) Glickman testified that at first, Atto approached Glickman while Walsh lingered behind, but both officers eventually joined the conversation. (*Id.* at 128:24-129:7, 130:21-23.) Atto testified that he did not recall the specifics of the conversation other than that Glickman had explained "he was there to walk around and enjoy the . . . park with his dog." (Atto Tr. at 11:14-24.) Walsh testified that he asked Glickman whether camp staff had been requesting that Glickman leave the camp alone, and that Glickman had given inconsistent answers. (Walsh Tr. at 21:21-23:24.) According to Glickman, his answers were in fact "very consistent" and the officers were "abnormally" and "unbelievably aggressive." (Glickman Tr. at 133:1,132:1-2, 133:9-12.)

Ruiz's report from that day appears to confirm that account in part; she wrote that after the officers finished with Glickman, they told her "they had 'put the fear of God in him' about interacting again with [M-NASR] campers." (Ruiz Report at 2.) The officers themselves testified that they acted professionally and were not trying to scare Glickman. (Walsh Tr. at 21:15-18; Atto Tr. at 14:14-16:4.) The officers issued a citation to Glickman for having his dog off leash. (Glickman Tr. at 134:6-8; Atto Tr. at 13:14-20.) Thereafter, Glickman took Ernie and left the park, heading home. (SOF ¶ 44; Glickman Tr. at 134:12-17.)

**E.  Walsh's Second Interaction with Glickman**

After Glickman left, the officers returned to the section of the park where camp staff had gathered and spoke to Pritchard and Ruiz, who had arrived by then. (Walsh Tr. at 25:22-26:1; Ruiz Report at 2.) Ruiz shared with the officers what Pritchard had said upon Ruiz's arrival: that there had been an "interaction . . . with the young girls and the photos." (Ruiz Report at 2.) Walsh acknowledged in his deposition that this was an alarming allegation that prompted "the start of the investigation." (Walsh Tr. at 25:2-26:17.) He stated further that after hearing this, he needed to track Glickman down, "because [Walsh] . . . could see that this might be going [ ] a different direction." (*Id.* at 25:6-7.) Atto left the scene to return to the station, as Walsh "was the primary officer" and "it was his obligation to gather all the information and complete the report." (Atto Tr. at 19:2-17.) Walsh headed towards Glickman's apartment to ask him further questions; Walsh testified that Glickman had "verbally told [the officers] his address, but [Walsh] didn't actually know if [the residence address Glickman had provided] was the truth or not." (Walsh Tr. at 25:2-13.) In fact, it was; Walsh found Glickman "right outside [his] building." (*Id.* at 28:20-23.)

Walsh testified that he confronted Glickman about the accusation that he had taken pictures of the young girls, which Glickman denied. (*Id.* at 29:20-30:18.) Walsh testified that Glickman told him he instead "took pictures of [his] dog"; Glickman himself denied having made such a statement and denied having taken pictures of Ernie. (*Id.* at 29:23-30:3; Glickman Tr. at 128:8-19, 137:6-8.) Walsh asked if he could see Glickman's phone, and Glickman refused.

(Walsh Tr. at 30:8-19; *see* Glickman Tr. at 135:15-21.) Glickman testified that Walsh told him "we're going to be watching you," and that he responded by asking whether he was under arrest or could go into his apartment. (Glickman Tr. at 135:22-136:1.) Walsh told Glickman he was not under arrest, and Glickman went inside his home. (Walsh Tr. at 31:4-14; Glickman Tr. at 136:1.)

**F. Glickman's Arrest**

Walsh then returned to the park to speak with camp staff. Ruiz had left the park, so Pritchard called her and put her on the phone to talk to Walsh.[4] (Ruiz Report at 2.) Ruiz wrote in her report that Walsh told her Glickman "had refused to show them his phone when they asked him about the photos, and that they had enough information now to arrest him for disorderly conduct." (*Id.*) Ruiz also wrote that the officers asked her if she would "like to make a complaint so the man would be arrested and [she] said yes," and that Walsh stated he would "let [Ruiz] know when [she] should come to the police station to sign the complaint." (*Id.*)

Shortly after going inside his apartment, Glickman decided that the officers' conduct amounted to "harassment." He therefore "decided the best thing to do was go down to the police station . . . [a]nd make a complaint." (Glickman Tr. at 137:20, 138:6-12.) Glickman testified that he went to the station, stepped up to the counter, and asked to speak with a "ranking officer on site." (*Id.* at 139:22-140:2.) He stated that "[a]bout five minutes went by, and then the two officers from the park were at the door." (*Id.* at 140:3-4.) Glickman testified that the officers stated: "[Y]ou saved us a trip from going to your house . . . you're under arrest." (*Id.* at 140:8-11; Pl.'s Additional SOF ¶ 31.)

Precisely what information prompted the arrest is unclear. Walsh testified that during his third conversation with camp staff at the park (immediately after he returned from outside

---

[4] Walsh testified that both Pritchard and Ruiz were present when he returned to the park. (Walsh Tr. at 31:23-32:11.) Ruiz documented in her report that she was already on the way back to her office and participated in this conversation by phone. (Ruiz Report at 2.) When this discrepancy was pointed out to Walsh during his deposition, he stated that he was not sure if he spoke to Ruiz in person or on the phone. (Walsh Tr. at 39:2-13.)

Glickman's apartment), Ruiz and/or Pritchard told him about "all the details of . . . the incidents that happened throughout the several days." (Walsh Tr. at 31:19-22.) Ruiz's report makes no reference to having said anything more to Walsh about her concerns with Glickman during this exchange. (*See generally* Ruiz Report.) Rather, the next thing Ruiz documented in her report was the officers "call[ing] back at approximately 5:30 pm" to "let [Ruiz] know that the man had posted bail." (*Id.* at 3.) Ruiz and Pritchard then went to the station and the officers directed Pritchard to "retell them about each interaction" with Glickman. (*Id.*) The officers took note of "all additional details" in Pritchard's account of what happened. (*Id.*) The officers told Ruiz and Pritchard that Glickman "had received 3 small citations related to his dog, and was also charged with disorderly conduct." (*Id.*)

The word "retell" and the phrase "all additional details" in Ruiz's report generates ambiguity about what the officers knew and when; it is possible Pritchard was "retelling" the officers about the conduct initially relayed by the police dispatcher (Glickman's asking personal questions, brushing up against a camper, and getting "verbal" with camp staff) as well as conduct noted by Ruiz after the officers first spoke to Glickman (the alleged picture-taking incident). If this is what happened, other alleged incidents over the 10-day period were part of the "additional details" that Pritchard went over for the first time at the station. But if Walsh's testimony is to be believed, nearly everything that was communicated later on at the station was a "retelling"; recall that Walsh testified that earlier, at the park, they had already gone over "every incident that occurred . . . throughout the week." (Walsh Tr. at 41:11-12.) Walsh testified that he took notes documenting what was said at the park, but that he "[d]iscarded them." (*Id.* at 42:7.) Pritchard testified that she "know[s] [that] when [she] was in the police station, [she] went into detail" about what was happening in the park, and that by her recollection, her communication at the station was the *first time* she told the police about Glickman's conduct over the prior 10 days. (Pritchard Tr. at 121:10-23.)

14

The officers both testified that prior to arresting Glickman, they spoke with Sergeant Daniel Warrensford at the police station.  (Atto Tr. at 19:21-22; Walsh Tr. at 33:19-25.)  Warrensford was a supervisory officer, meaning that officers Walsh and Atto worked under his command. (Warrensford Tr., Ex. I to SOF [106-11] (hereinafter "Warrensford Tr.") at 97:16-21.)  Warrensford testified that he "recall[ed] a meeting with them at the station, but as far as the content of that conversation, [he] [did not] recall."  (*Id.* at 11:4-17.)  He later clarified that he did not "recall exactly . . . [the] back-and-forth conversation," but that "[t]he end result was, based upon the probable cause that they reiterated . . .  there was probable cause to make an arrest and go arrest the defendant."  (*Id.* at 13:1-16.)  Warrensford also testified that Pritchard's alleged observation of Glickman's taking photos would have been alarming information that he relied on in deciding whether to direct the officers to arrest Glickman.  (*Id.* at 19:4-16, 20:16-20.)

The misdemeanor complaint, signed by Ruiz and Pritchard before leaving the station, does not specifically mention the alleged picture-taking incident.  It states that Glickman committed the offense of "Disorderly Conduct" in that he

> Knowingly and intentionally entered Austin Park for over a week with a dog that was unleashed during the hours that a handicap camp was in session.  While at the park, the defendant engaged in conversations with handicapped children with the dog present.  The defendant was asked by camp staff not to speak with the children because of their conditions.  The defendant refused to comply with their multiple requests for he and his dog to stay away from the children.  The defendant's actions alarmed and disturbed the complainant.

(Misdemeanor Compl. [106-10] at 2.)  Walsh stated in his testimony that it was important for Pritchard—not just Ruiz—to sign this complaint, because Pritchard was the witness.[5]  (Walsh Tr. at 52:1-22.)

---

[5]    As described earlier, Pritchard later testified that she did not personally witness any of the alleged incidents other than the time a camper punched Ernie, the time that Glickman was talking to a camper, and the time or times that Pritchard personally spoke to Glickman.

For their part, the officers testified that they made the arrest based on the totality of Glickman's conduct at the park, as reported to them by Pritchard and Ruiz.  (SOF at ¶ 51; Pl.'s Resp. to Defs.' SOF ¶ 51.)  Walsh specifically testified:

> The pictures, they didn't exist to me because I didn't see them, so he was – this whole investigation was based upon his actions at the park.  Per the police, we don't have the evidence, I didn't have a warrant to look at his phone.  For me, the – those pictures didn't exist . . . .

(Walsh Tr. at 76:1-7.)  Defendants emphasize this testimony in their statement of facts.  (*See* SOF ¶¶ 51-52.)  Plaintiff accurately notes in response that the "[p]olice arrested Glickman on the basis of information they received from Pritchard and Ruiz."  (Pl.'s Resp. to Defs.' SOF ¶ 52.)  That is, the officers had no tangible evidence of the alleged picture-taking incident or tangible evidence of any other alleged incident; the evidence they relied upon were the statements of Pritchard and Ruiz.  (*See* Atto Tr. at 35:1-10 (stating that without the information received from Pritchard and the willingness of camp staff to sign the complaint, the officers "would not be able to arrest him").)

At a bench trial in March 2018, a judge in the Circuit Court of Cook County convicted Glickman of disorderly conduct.  (SOF ¶ 54; Tr. Excerpts from Pl.'s First and Second Disorderly Conduct Trials, Ex. J to SOF [106-12] (hereinafter "Tr. Excerpts") at 3:13-17.)  Several months later, however, the court granted Glickman's motion for a new trial because the criminal complaint did "not state disorderly conduct correctly" and then granted Glickman's motion to dismiss the charges.  (Tr. Excerpts at 7:2-22.)  On July 18, 2018, Glickman filed a civil complaint before this court, and on February 20, 2019, he filed his second amended complaint.  (Pl.'s Compl. [1]; Pl.'s Second Am. Compl. [38].)  In his second amended complaint, he asserts, *inter alia*, that Defendants Ruiz and Pritchard violated 42 U.S.C. § 1983 by depriving him of his Fourth Amendment right to be free from unreasonable arrest or unreasonable seizure.  (Pl.'s Second Am. Compl. ¶ 53.)  On Defendants' motion, this court dismissed all claims other than the Fourth Amendment claim against Pritchard and Ruiz.  *See generally Glickman v. Main-Niles Ass'n of Special Recreation*, 440 F. Supp. 3d 946 (N.D. Ill. 2020).  Defendants now seek summary

16

judgment on Glickman's remaining claim. For the reasons stated below, that motion is granted in favor of Defendant Ruiz and otherwise denied. .

## DISCUSSION

The court will grant a motion for summary judgment if the evidence establishes that there are no genuine issues of material fact, and that the moving parties entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). In deciding such a motion, the court does not assess the credibility of witnesses or choose between competing reasonable inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986). Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). Many material facts are disputed in this case; for purposes of Defendants' motion, the court resolves those disputes in a light favorable to Glickman "without vouching for the objective truth of this account." *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010).

Defendants make two arguments in support of their motion for summary judgment. First, they argue that Pritchard and Ruiz did not violate Glickman's constitutional rights because they had probable cause to report their concerns to the police and sign the criminal complaint. Second, they argue that even if Pritchard and Ruiz did not have probable cause, they cannot be held liable because they are entitled to qualified immunity. The court takes these arguments in turn.

## A.     Probable Cause

For Glickman to prevail on his Fourth Amendment claim for unreasonable arrest or unreasonable seizure, there must be a genuine dispute of material fact regarding whether Ruiz and/or Pritchard had probable cause to take certain actions that caused Glickman to be arrested for disorderly conduct. *See Stokes*, 599 F.3d at 617. The court notes that the context is somewhat unusual, in that the Defendants being charged with a Fourth Amendment violation are

two park district employees[6] who did not personally arrest Glickman. However, the Seventh Circuit stated in an analogous case that a school principal "could be liable for false arrest if he lacked probable cause to allege the criminal acts detailed in the complaint." *Id.* at 624 n.2 (citing *Acevedo v. Canterbury*, 457 F.3d 721, 723 (7th Cir. 2006)). Here, as in *Stokes*, the plaintiff's arrest for disorderly conduct would not have occurred but for the accusations made by Defendants, including accusations made in a complaint signed by Defendants. Thus, the probable cause analysis in this case focuses on the perspectives of the Defendants, not the arresting officers—that is, the concern is not whether Defendants' communications to the officers gave the officers probable cause to arrest Glickman, but whether the Defendants had probable cause to make those accusations in the first place. *Glickman*, 2019 WL 1754091, at *8 n.9.

Probable cause depends on "the facts and circumstances within the defendant's knowledge" as perceived by "a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect." *Stokes*, 599 F.3d at 622 (citations omitted). Defendants will not be liable so long as the facts, reasonably perceived, "are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Id.* (citation omitted). While the "reasonable person" analysis in Fourth Amendment cases usually compares the defendant's action to a hypothetical arresting officer, here the probable cause analysis is somewhat more generous to Defendants; like the principal in *Stokes*, Defendants are "responsible for maintaining order and protecting the children in [their] charge," and are "not responsible for performing police investigations." *Id.* at

---

[6] The parties do not discuss whether Pritchard and Ruiz were acting "under color" of state law when they allegedly deprived Glickman of his constitutional rights. *See* 42 U.S.C. § 1983. While § 1983 claims are most commonly brought against government officials, they can be brought against private citizens in certain contexts. *See Filarsky v. Delia*, 566 U.S. 377, 383 (2012) ("Anyone whose conduct is 'fairly attributable to the State' can be sued as a state actor under § 1983.") (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). The court briefly discusses the status of Defendants as state actors in its discussion of qualified immunity below.

625.  As a result, "[t]he amount of information that [Defendants] could reasonably be expected to gather" before causing plaintiff's arrest "was limited."  *Id.*

The probable cause determination also depends on the elements of the applicable criminal statute.  *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012).  Glickman was arrested for disorderly conduct, which Illinois law defines as "knowingly [doing] any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace."  720 ILCS 5/26-1.  The Illinois Supreme Court explained that the offense of disorderly conduct "is intended to guard against an invasion of the right of others not to be molested or harassed, either mentally or physically, without justification."  *People v. Davis*, 82 Ill.2d 534, 538, 413 N.E.2d 413, 415 (1980).  Illinois courts have found that arrests for disorderly conduct were justified for behavior such as direct harassment, threats, or conduct similar to stalking.  *See Reher v. Vivo*, 656 F.3d 772, 777 (7th Cir. 2011) (collecting cases).

There is no genuine dispute of material fact regarding Ruiz's probable cause for calling 911, relaying the allegations to officers Walsh and Atto, and signing the criminal complaint.  As Ruiz documented in her report on July 20, 2017—and which Glickman does not deny—Pritchard told Ruiz that Plaintiff was engaging in alarming behavior that included "brushing up against one of [the] campers, and grabbing one of [the] campers as he was running past [Glickman]."  (Ruiz Report at 1.)  Then, after Ruiz called the police and arrived at the park, Pritchard—who Ruiz characterized as being "visibly upset" at the time—told her that Glickman had been speaking with two young girls and was taking pictures of them on his cell phone.  (*Id.* at 2.)  Ruiz was relying on a report from her most senior staff person at Austin Park when she decided to pursue Glickman's arrest.  (*Id.*)  The record suggests her role in signing the complaint was less significant than Pritchard's; Ruiz stated in her report that the police "requested [Pritchard's] name on the complaint as well since she was the actual witness to the situations."  (*Id.* at 3.)

Ruiz's perspective on these circumstances is similar to that of officers Atto and Walsh, who were found to have had probable cause to arrest Glickman.  *Glickman*, 2019 WL 1754091,

at *8.  By all accounts, Ruiz trusted Pritchard, who she considered to be the "actual witness," and it was therefore reasonable for Ruiz to believe that Glickman was engaged in harassing, stalking, and physically threatening behavior.  Like the *Stokes* principal who arrived belatedly at the scene of a fight, Ruiz "did not have the time or the duty to carry out a police investigation," and it was reasonable for her instead to act swiftly to protect the vulnerable children in her care.  *Stokes*, 599 F.3d at 625.  Based on Pritchard's troubling allegations, quick action was warranted.  As Ruiz had probable cause for the actions she took, the court grants summary judgment on Glickman's claim against her.

Pritchard's actions differ.  What actually happened is contested.  But interpreting the facts in a light favorable to Glickman, he engaged in virtually no behavior that a reasonable person in Pritchard's position would find alarming.  The counselors spoke to Pritchard about him in a derogatory manner, but there is otherwise no undisputed evidence that they reported alarming conduct.  Despite those realities, Pritchard presented herself to Ruiz and the arresting officers as an eyewitness to egregious conduct, despite not having personally witnessed the incidents.  The court briefly recounts the alleged incidents—resolving disputes in Glickman's favor—one at a time.

First, the incident involving the camper punching Ernie does not appear to constitute disorderly conduct.  Glickman did have his dog off leash, and he later received citations as a penalty.  It is worth noting that M-NASR counselors failed to prevent the child from assaulting the dog—a failure that appears to have prompted Pritchard to apologize to Glickman and quickly move on.  As Ruiz's report states, "[t]he man was friendly at this time."  (Ruiz Report at 1.)

A second incident occurred when Glickman spoke to an older camper who was in the vicinity of the rest of the camp, including a counselor.  Glickman acknowledges having had an exchange with the camper, but though he does not recall the specifics, he denies asking the camper any inappropriate questions, including any questions about the child's name, disability, or age.  At another point in time, Glickman also spoke to a different camper, thanking that camper

for having just petted his dog; by Glickman's account, he did not use the child's name, and by the observing counselor's account, Glickman used the name only after the counselor herself used it. Under either version of events, a reasonable person would not find these interactions to be remotely suspicious. Casual conversation with a person at a public park—including with a child in close proximity to adult supervision—is not alarming or disturbing to a reasonable person. That is particularly true in the context here, given that Defendants do not suggest that they had yet asked Glickman to keep his distance. Moreover, there is no real indication that the camp yet *wanted* Glickman to keep his distance, at least during the incident involving a camper petting Ernie; Simon, the camper's counselor, testified that she told the camper "[g]ood job" (Simon Dep. at 19:6-12), which could reasonably be interpreted as affirming not just the camper's conduct, but also Glickman's conduct in creating the opportunity for the camper to have a successful interaction with Ernie.

The next three alleged incidents—Glickman touching a camper, watching the campers, and flying a drone over a shirtless camper—did not happen, if the record is viewed, as required, in the light most favorable to Glickman. Pritchard admitted that she did not personally witness any of these incidents. (Pritchard Tr. at 32:11-15, 171:21-172:12, 29:18-20.) Simon, who was allegedly involved in both the touching and drone incidents, did not identify Glickman as being involved in or responsible for either incident. (Simon Dep. at 34:4-17, 36:19-37:1.)

Glickman had a conversation with assistant site director Spiewak, in which she asked him to keep his dog away from the camp due to the potential for allergic reactions amongst the campers. Glickman believes, and told Spiewak, that his dog is hypoallergenic and could not have generated these concerns. Glickman nevertheless tried to avoid the camp the next day but failed because he had received incorrect information about when the camp was in session. Hoping to get accurate information, he asked a counselor, who told him the correct hours and directed him to Pritchard, who, according to Glickman, assured him that he was free to stay in the park so long as he kept Ernie away from the one camper who had punched him.

Pritchard, of course, has a different narrative. Pritchard testified that Glickman was defensive during his interactions with her, and it appears Glickman did tell Pritchard he had the right to be in the park when he wished. Glickman nevertheless denies behaving in a defensive manner. There is, thus, a genuine dispute of material fact regarding his demeanor when interacting with Pritchard.

The final alleged incident is Pritchard's assertion to Ruiz that Glickman was taking pictures of two young girls (non-campers) at the park. There is no evidence this actually occurred. For reasons he has not explained, Glickman chose not to open his phone for the officers, but he denies having taken any such photos. As she did with respect to other incidents, Pritchard later admitted that she did not personally witness it happen, even though it appears that she suggested otherwise to Ruiz and the arresting officers.

Taken collectively, a jury may find that Pritchard's allegations concerning Glickman were exaggerated or false. Unlike Ruiz, Pritchard was physically present at the camp for the ten-day period when the alleged incidents occurred. Yet Pritchard did not witness anything inappropriate firsthand. Though she might claim to have relied on the words of her counselors—as Ruiz relied on her—the circumstances here are different; as noted, Simon's testimony contradicts Pritchard's assertions. That is true for the two most alarming incidents alleged: Glickman touching a camper and Glickman taking pictures of young girls. While Pritchard testified that Simon conveyed this information to her, Simon testified that she did not witness either incident. (Simon Dep. at 20:4-16; 34:4-17.)

The summary judgment standard of review is critical here. Glickman's factual account raises questions; among other things, the court is curious as to why Glickman never bothered to leash his dog, as required by ordinance, even as tensions rose over the 10 days. At this stage, however, resolving all disputed acts in his favor, the court is left with an account of a non-threatening individual and his puppy, sharing a small public park with children, and—due to the puppy's enthusiasm—occasionally bumping into the campers and asking innocuous questions.

If this is all that happened, a reasonable jury could conclude that these incidents were not threatening and did not support a call to police and a criminal complaint. In sum, because a jury could find that Pritchard lacked probable cause, the court can only grant her motion for summary judgment if it finds that she is entitled to qualified immunity.

## B.     Qualified Immunity

This court previously considered and rejected Defendants' claim of qualified immunity. *Glickman*, 440 F. Supp. 3d at 959-60. The different standard of review at the summary judgment stage warrants a fresh look, however; "while qualified immunity may not entitle a defendant to dismissal on the pleadings, qualified immunity may entitle the defendant to summary judgment later on." *Hanson v. LeVan*, 967 F.3d 584, 592 (7th Cir. 2020). That is, the development of the factual record that followed Defendants' earlier motion may now justify a different outcome.

Qualified immunity "shields a public official from suit for damages unless caselaw clearly puts [her] on notice that [her] action is unconstitutional." *Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019). As an initial matter, the parties have not always been in agreement about whether Pritchard and Ruiz are "public officials" protected by this doctrine. In opposing Defendants' motion to dismiss, Glickman asserted that Defendants are not public officials. (Pl.'s Mem. in Opposition to Defs.' Mot. to Dismiss [46] at 15.) Defendants contend that they are. (Defs.' Reply in Support of Mot. to Dismiss [47] at 7.) In its ruling on the motion to dismiss, the court noted that "Defendants are correct that courts have treated individuals in similar positions as government officials." *Glickman*, 440 F. Supp. 3d at 956 n.6 (citing cases).[7] The parties have not again addressed the

---

[7]      A case in addition to those earlier cited by the court is the Supreme Court's decision in *Filarsky v. Delia*, 566 U.S. 377 (2012), which extended qualified immunity to a private citizen for reasons that are applicable here. In that case, a private attorney retained by a municipality on a part-time basis was able to assert qualified immunity because the doctrine's primary justifications—protecting "government's ability to perform its traditional functions" and avoiding "unwarranted timidity in the performance of public duties"—applied with "vital importance" to the defendant. 566 U.S. at 389 (citations omitted). The Court noted that "[s]ometimes . . . private individuals will work in close coordination with public employees, and face threatened legal action for the same conduct." *Id.* at 391. Glickman's arrest was a public "function" for which Defendants' public counterparts—officers Walsh and Atto—could (and did)

"public officials" issue in their briefing on Defendants' motion for summary judgment, and that issue is not dispositive at this stage; the court has granted Ruiz summary judgment on the merits and concludes, as explained below, that Pritchard cannot claim qualified immunity for reasons other than her status as a public official.

Assuming for now that Defendants are "public officials," the court notes, first, that to overcome a claim of qualified immunity, Glickman would have to establish that his Fourth Amendment constitutional right was "clearly established at the time of the alleged violation." *Campbell*, 936 F.3d at 545 (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009)). The Seventh Circuit has held that "[t]o be clearly established, at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what [s]he is doing violates that right . . . and existing precedent must have placed the statutory or constitutional question beyond debate." *Chasensky v. Walker*, 740 F.3d 1088, 1094 (7th Cir. 2014) (quoting *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012)). While it is not necessary for "the very act in question [to have] been previously held unlawful," the "unlawfulness must be apparent" to the official "in the light of pre-existing law." *Anderson v. Creighton*, 483 U.S. 635, 640 (7th Cir. 1987).

This court previously noted that no case decided prior to July 2017 holds that camp staff may not tell lies to protect campers. *Glickman*, 440 F. Supp. 3d at 959. Yet, the court continued, there is a well-established right to be free from an arrest that is premised on lies. (*Id.* (citations omitted)). *Stokes* is again instructive. The Seventh Circuit held that "[s]ince the police gave [the principal] the authority to sign a criminal complaint, [the principal] could be liable for false arrest if he lacked probable cause to allege the criminal acts detailed in the complaint." *Stokes*, 599 F.3d at 624 n.2. Here, if Pritchard and Ruiz lacked probable cause to allege the criminal acts detailed

---

assert qualified immunity. *See Glickman*, 2019 WL 1754091, at *8. It makes little sense for Defendants to be left "holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Filarsky*, 566 U.S. at 391.

in the complaint that they signed, then the unlawfulness of their actions was apparent, and they cannot claim qualified immunity.

The Supreme Court recently decided two cases that considered what is required for a right to be well established. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam); *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021) (per curiam). The facts and procedural history of each case are similar; an officer was accused of using excessive force, and the appellate court in each instance denied the officer qualified immunity where prior caselaw—under different circumstances—had held an officer accountable for excessive use of force. In reversing the appellate courts, the Supreme Court instructed lower courts "not to define clearly established law at too high a level of generality." *Bond*, 142 S. Ct. at 11. That instruction is well-heeded here; Glickman's allegations against Pritchard and Ruiz closely resemble the Seventh Circuit's admonition in *Stokes* that it is unlawful to sign a criminal complaint without probable cause.

Defendants misconstrue Glickman's constitutional right in their argument. They state that it would be "preposterous" and "absurd" to conclude that a person has a constitutional right to "infiltrate a summer camp," engage in inappropriate "conduct toward children with disabilities," or "engage in criminal activity." (Defs.' Mem. in Supp. of Mot. for Summ. J. [105] (hereinafter "Defs.' Mem.") at 10-11.) This argument, of course, assumes that Glickman did in fact infiltrate, act inappropriately, and engage in criminal activity. For reasons already explained, there are disputes about whether those assertions are true.

Defendants argue that Pritchard and Ruiz did not knowingly lie in causing Glickman to be arrested. The court agrees with respect to Ruiz; as discussed above, the court is satisfied that Ruiz had probable cause to call the officers, tell them what she heard, and sign the criminal complaint as a non-witness. Ruiz justifiably assumed information conveyed by Pritchard was accurate, and she passed it along to the arresting officers believing it was true. Indeed, Glickman recognized this. Asked at his deposition for the basis of his belief that Ruiz had lied about him, Glickman testified:

25

> A:  Look, Lauren [Ruiz] wasn't at the park, so most of the information she relayed was just given from Pritchard, so it's hard to say that, you know, she's directly lying as opposed to being misinformed, right, and so that's -- so it's hard to say, you know, it's hard to say on Ruiz's end, but I can tell you that Pritchard wasn't telling you the truth, Blaire Pritchard wasn't telling you the truth.

(Defs.' Mem. at 12; Glickman Tr. at 148:9-18.)  There is no evidence in the record that Ruiz lied or lacked probable cause; her conduct is therefore shielded by the doctrine of qualified immunity.

Defendants argue that Pritchard is protected too, and they point out that Pritchard did not call the police.  (Defs.' Mem. at 13.)  While true, that statement does not tell the full story.  From the facts as discussed, a reasonable juror could conclude: (1) Pritchard's report to Ruiz prompted Ruiz to call the police; (2) Pritchard's complaint about Glickman taking photographs of young girls caused the officers to track down Glickman outside his home and later decide they had enough evidence to arrest him; and (3) Pritchard's signature on the criminal complaint as a witness was crucial for the charges to be brought against Glickman.  Considered this way, Pritchard had by far the most significant role in causing Glickman's arrest.

There is a dispute of material fact as to whether Pritchard lacked probable cause to take those three key actions.  Ruiz's report and the arresting officers' testimony strongly suggest that Pritchard presented her allegations to Ruiz and the authorities as if she were a firsthand witness when—as she admitted—she frequently was not.  (*See, e.g.*, Pritchard Tr. at 172:3-5; Atto Tr. at 17:16-18:18; Walsh Tr. at 43:18-44:6, 49:8-12, 49:8-50:3, 51:5-13, 52:1-22; Ruiz Report at 3.) And as discussed, Pritchard's testimony about the incidents—including what happened, who saw them, and who reported them—is contradicted not just by Glickman but also by one of her counselors, Hillary Simon.  As Defendants emphasize, when she made her reports, Pritchard was noticeably upset, disturbed, and alarmed.  (Defs.' Mem. at 13-14.)  A reasonable jury might well conclude from this evidence that Pritchard honestly viewed Glickman to be a serious threat to the safety of the campers.  But her concern for the children could also have led her to misconstrue what she saw and heard—and possibly to make up allegations she neither saw nor heard about— in order to expedite the sequence of events leading to Glickman's arrest.  Similarly, her concern

could distort the image of a man and his puppy having an innocent conversation with students who recognized him from school into looking more like a stranger surreptitiously taking pictures of two young girls.  The mere fact that Pritchard was upset does not change the court's conclusion that there is a dispute of material fact as to whether she lacked probable cause when she signed the criminal complaint.

As noted, the most troubling information Pritchard conveyed was her statement that she had personally witnessed Glickman's alleged disturbing behavior, including grabbing a camper and taking pictures of young girls.  Had Pritchard honestly told the officers that she did not witness that conduct, the officers might well have asked Simon for a firsthand account.  And had Simon then told the officers what she later stated in her deposition—that she in fact had not witnessed those incidents—the officers themselves may not have had probable cause to arrest Glickman. *See, e.g.*, *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 439 (7th Cir. 1986) ("When an officer has 'received information from some person—*normally the putative victim or eye witness*—who it seems reasonable to believe is telling the truth,' he has probable cause.") (emphasis added) (citation omitted).

Thus, there is a dispute of material fact as to whether Pritchard had probable cause to sign the criminal complaint.  For that reason, the court cannot, at this stage, conclude that she is entitled to qualified immunity or summary judgment.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment [104] is granted as to Defendant Lauren Ruiz and denied as to Defendant Blaire Pritchard.

ENTER:

Dated:  March 9, 2022

REBECCA R. PALLMEYER
United States District Judge